J-S23030-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L.D., MOTHER | |
| | No. 567 EDA 2026 |

Appeal from the Order Entered February 3, 2026
In the Court of Common Pleas of Wayne County Civil Division at No(s):
CP-64-DP-0000009-2021

| | |
|---|---|
| IN RE: J.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L.D., MOTHER | |
| | No. 568 EDA 2026 |

Appeal from the Decree Entered January 28, 2026
In the Court of Common Pleas of Wayne County Civil Division at No(s):
2025-00020

| | |
|---|---|
| IN THE INTEREST OF: S.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L.D., MOTHER | |
| | No. 569 EDA 2026 |

Appeal from the Order Entered February 3, 2026
In the Court of Common Pleas of Wayne County Civil Division at No(s):
CP-64-DP-0000010-2021

| | |
|---|---|
| IN RE: S.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |

```
                                    :
APPEAL OF: S.L.D., MOTHER           :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :  No. 570 EDA 2026
```

Appeal from the Decree Entered January 28, 2026
In the Court of Common Pleas of Wayne County Civil Division at No(s):
2025-00021

```
IN THE INTEREST OF: J.S., A MINOR   :  IN THE SUPERIOR COURT OF
                                    :        PENNSYLVANIA
                                    :
APPEAL OF: S.L.D., MOTHER           :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :  No. 571 EDA 2026
```

Appeal from the Order Entered February 3, 2026
In the Court of Common Pleas of Wayne County Civil Division at No(s):
CP-64-DP-0000011-2021

```
IN RE: J.S., A MINOR                :  IN THE SUPERIOR COURT OF
                                    :        PENNSYLVANIA
                                    :
APPEAL OF: S.L.D., MOTHER           :
                                    :
                                    :
                                    :
                                    :
                                    :  No. 572 EDA 2026
```

Appeal from the Decree Entered January 28, 2026
In the Court of Common Pleas of Wayne County Civil Division at No(s):
2025-00022

BEFORE:   LAZARUS, P.J., MURRAY, J., and FORD ELLIOTT, P.J.E.*

_____

* Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY MURRAY, J.:                    **FILED AUGUST 13, 2026**

S.L.D. (Mother) appeals from the decrees granting the petitions filed by Wayne County Children and Youth Services (CYS or the Agency) and involuntarily terminating Mother's parental rights to J.S., J.L.T.S. (daughters born in June 2013 and November 2019, respectively),[1] and S.S. (a son born in May 2015) (collectively, Children);[2] and the orders changing Children's permanency goals from reunification to adoption. After careful review, we affirm the decrees and orders.

We glean the relevant factual and procedural history from the orphans' court's opinion and the certified record.[3] Mother and Father had a lengthy history with CYS, dating back to 2012. In August 2024, while Father was incarcerated, Children were placed into CYS's emergency protective custody, after Mother's alcohol-related emergency hospitalization. On September 3, 2024, following a hearing, the orphans' court issued substantially identical orders adjudicating Children dependent, and ordering Children to remain in

_____

[1] For ease of reference, we identify J.L.T.S. using her middle initials.

[2] Children's biological father, Je.S. (Father), voluntarily relinquished his parental rights on January 27, 2026. Father is not a party to the instant appeal.

[3] At the January 27, 2026, termination of parental rights (TPR) hearing, without objection, the orphans' court took judicial notice of "the entirety of the dependency docket[s]." N.T., 1/27/26, at 4-5. The Honorable Matthew L. Meagher presided over all relevant proceedings at both the juvenile and orphans' courts' dockets.

foster care. Orders, 9/3/24, at 1-2.[4] The orphans' court additionally ordered Mother to undergo drug and alcohol and parental fitness evaluations, and to comply with the evaluators' recommendations. *Id.* at 5.

The matter proceeded to permanency review hearings in December 2024; May, June, and October 2025; and January 2026. The orphans' court consistently rated Mother's compliance with the permanency plan as moderate to minimal, and largely found Mother to have made minimal to no progress toward alleviating the circumstances necessitating Children's placement.

On November 5, 2025, CYS filed petitions requesting that the orphans' court schedule a permanency goal-change hearing. On November 12, 2025, CYS filed TPR petitions seeking the involuntary termination of Mother's parental rights to Children, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). In its substantially similar TPR petitions, CYS alleged that, despite the numerous services it had offered to her, Mother was unable or unwilling to remedy the circumstances necessitating Children's placement. TPR Petitions, 11/12/25, ¶ 12(e).

The orphans' court conducted a hearing on CYS's goal-change and TPR petitions on January 27, 2026. Mother appeared, represented by counsel.

_____

[4] CYS placed Children with different foster families, as described below. The orphans' court found that CYS made reasonable efforts to place Children together. *See* Orders, 9/3/24, at 2 (the orphans' court noting that CYS "sent out approximately 20 referrals to foster homes for [C]hildren to be placed together. None have been identified as able to take [C]hildren so far. [CYS] has also made numerous family finding phone calls.").

- 4 -

Children did not appear, but were represented by their legal counsel and guardian *ad litem*, Lindsey Collins, Esquire (GAL).[5]  CYS presented the testimony of CYS caseworker Michael Murolo (Mr. Murolo); Premier Biotech Labs technical operations director Garrett Cook (Mr. Cook); licensed therapist Martin Kravchick (Mr. Kravchick); and Justice Works family resource specialist Monique Mitchell (Ms. Mitchell).  Mother testified on her own behalf.

Mr. Murolo testified that he has worked with the family since September 2024.  N.T., 1/27/26, at 33.  Mr. Murolo explained that in August 2024, Children were removed from Mother's care after Mother was taken to the hospital to treat alcohol-related seizures.  *Id.* at 7; *see also id.* (Mr. Murolo testifying that Mother had a blood alcohol content of .40 percent upon her admission to the hospital).  Mr. Murolo testified that prior to Children's placement, CYS "had a substantial history with the family[,]" which arose from concerns regarding "drugs and alcohol [], domestic violence, … and [poor] living conditions."  *Id.* at 6.

_____

[5] On November 13, 2025, the orphans' court appointed GAL to serve as Children's legal counsel and guardian *ad litem*.  Orders, 11/13/25.  The orphans' court specifically found that "there is no conflict of interest between [Children's] best interests and legal interests[,] and that there is no impediment to [GAL] being appointed as legal counsel for [Children]."  *Id.*; *see also Interest of H.H.N.*, 296 A.3d 1258, 1264 (Pa. Super. 2023) ("[W]here there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

Mr. Murolo testified that Mother's permanency goals were to (1) maintain sobriety; (2) address her mental health; and (3) maintain a safe and stable living environment for Children. *Id.* at 22.[6]

Regarding Mother's mental health goal, Mr. Murolo testified that while Mother receives medication management services through the Wright Center, she had not participated in therapy "for the duration of the dependency case[,]" until shortly before the TPR/goal-change hearing. *Id.* at 23; *see also id.* at 25 (Mr. Murolo testifying that Mother's counselor at the Wright Center advised him that the Wright Center is "more of a Suboxone clinic where y[ou] do [Medication-Assisted Treatment (MAT)]"; and that Mother told Mr. Murolo that she did not want to attend any other programs that CYS suggested). Mr. Murolo testified that Mother had been receiving individual counseling through the Dunmore Comprehensive Treatment Center (Dunmore CTC), but that Mother was not utilizing all the services Dunmore CTC offered. *Id.* at 49.

Regarding Mother's compliance with her drug and alcohol goal, Mr. Murolo testified that

---

[6] Mr. Murolo testified that Mother was additionally required to follow recommendations set forth in her parental fitness evaluation, which she completed in January 2025. N.T., 1/27/26, at 31, 48, 51. CYS did not proffer the parental fitness evaluation as an exhibit. However, CYS's Exhibit 4 (CYS Worksheet, prepared by Mr. Murolo), which was admitted without objection, indicated that Mother's parental fitness evaluation concluded that "[t]he primary barrier to [Mother's] fitness as a parent is her dishonesty and lack of accountability." Exhibit 4 at 11; *see also* N.T., 1/27/26, at 23 (Mr. Murolo testifying that Mother's parental fitness evaluation recommended that Mother "make significant progress … in therapy.").

[Mother] has not drug screened with the Agency since … July of [2025]. Throughout the duration of [the] dependency [case,] there [were] a few instances where there were positive [drug] screens. The last screen in July, [Mother] did test positive for methamphetamine. [Mother] has accused the Agency in the past [of] tampering with drug screens. [] When we stopped drug screening [Mother], we were asking Justice Works to do it since [Mother] was going there weekly for visits anyway. After that July drug screen [Mother] refused all drug screens from Justice Works or from [CYS] …. [] The Agency did try to sign [Mother] up for a separate drug testing program[, *i.e.*, Aver Health]. … [Mother] said she would not be able to work with that program because she said transportation would be an issue.[7]

*Id.* at 26-27 (capitalization modified; footnote added); *see also id.* at 48 (Mr. Murolo testifying that Mother did not consistently work with any drug and alcohol treatment provider in the year preceding the TPR/goal-change hearing); Exhibit 2 (Mr. Cook's amended report, indicating Mother's July 2025 drug screen tested positive for methamphetamine). *But see* N.T., 1/27/26, at 34 (Mr. Murolo testifying that Mother completed an inpatient drug and alcohol program in 2024, before a permanency plan was created).

Concerning Mother's housing, Mr. Murolo acknowledged that Mother had utilized a dumpster, secured for her by CYS, to clear clutter from her mother's (maternal grandmother) home, where she and Children had last resided. *Id.* at 28-29. According to Mr. Murolo, however, at his last home visit, in September 2025, Mother advised him that she was no longer residing at

---

[7] Mr. Murolo testified that CYS was unable to offer Mother transportation due to the random nature of Aver Health's drug testing program. N.T., 1/27/26, at 35.

maternal grandmother's residence. *Id.* at 51. Mr. Murolo testified that Mother refused to tell him where she was currently living. *Id.*

Mr. Murolo testified that throughout the dependency case, Mother attended 29 out of 47 supervised visits with Children offered to her by CYS, and facilitated by Justice Works. *Id.* at 10. Of the visitation sessions Mother attended, Mr. Murolo explained that Justice Works' staff (JWS) "reported visits weren't going the best. Often when it came to disciplining [C]hildren, [JWS] did most of that. … [Mother] wasn't always prepared for visits. There were many concerns [regarding Mother] nodding off." *Id.* at 14. According to Mr. Murolo, the orphans' court suspended Mother's visitation with Children on October 14, 2025, due to safety concerns that arose after Mother "made a [] threat while speaking to [JWS] that [Mother] was go[ing to] possibly shoot a member of the CYS team." *Id.* at 13-14.[8]

Mr. Murolo testified that, since visitation with Mother was discontinued, Children have not inquired about resuming visitation sessions. *Id.* at 15; *see also id.* at 41 (Mr. Murolo testifying that Children have not asked about Mother). Mr. Murolo opined that Mother and Children share a bond, but indicated that CYS believed that severance of that bond was in Children's best interests. *Id.*

_____

[8] Mother testified that this incident resulted in criminal charges being filed in Pike County, which were pending at the time of the TPR/goal-change hearing. N.T., 1/27/26, at 136.

Mr. Murolo testified that J.S. and J.L.T.S. resided with foster resource B.M. from August 2024 to December 2025. *Id.* at 7. J.S. and J.L.T.S. transitioned to living with their current foster mother, D.F., because B.M. was not a pre-adoptive resource. *Id.* Mr. Murolo explained that J.S. and J.L.T.S. began living with D.F., a pre-adoptive resource, after having "visits and weekend visits" with D.F. beginning in September 2025. *Id.* According to Mr. Murolo, J.S. and J.L.T.S. have a "good relationship with [D.F.] and were excited about the move." *Id.*; *see also id.* at 32 (Mr. Murolo testifying that J.S. and J.L.T.S. share a bond with D.F.).

Mr. Murolo testified that S.S. has resided with his foster mother, M.B., since August 2025. *Id.* at 8. Mr. Murolo testified that S.S. eats and sleeps well in M.B.'s residence, and S.S. had not had any incidents of incontinence since moving in with M.B., which had previously been an issue for S.S. *Id.* According to Mr. Murolo, M.B. facilitated S.S. engaging in several extracurricular activities; however, scheduling conflicts resulted in S.S. missing sessions with his therapist, Mr. Kravchick. *Id.*; *see also id.* at 9 (Mr. Murolo testifying that Mr. Kravchick recommended finding S.S. a new therapist, and that CYS was in the process of doing so). Mr. Murolo opined that S.S. shares a strong bond with M.B. *Id.*; *see also id.* at 87 (Mr. Kravchick testifying that S.S. has reactive attachment disorder (RAD), which "is usually caused when a child does not get proper attention and caring[,]"

but that S.S. and M.B. are "very close[,]" and S.S. is "getting [proper attention and care] now[,] and he's doing very well in his foster home.").

The orphans' court summarized the following relevant testimony of Children's therapist, Mr. Kravchick:

> Mr. Kravchick … testified that he began working with [C]hildren on October 1, 2024. [Mr. Kravchick] testified that they started working on basic hygiene. Over time, [C]hildren began disclosing details of their relationship with [M]other. … Mr. Kravchick testified that, at first, there was an emotional attachment between [C]hildren and Mother, and that it was not a healthy bond, but a fearful one. [Mr. Kravchick] testified that [C]hildren would display more troublesome behaviors just prior to and just after visits with Mother. [Mr. Kravchick] noted that since visits have stopped, [C]hildren have been much more stable[,] and that their emotional regulation is much better.
>
> Mr. Kravchick testified that [C]hildren stopped talking about Mother … several months ago[,] since the visits [] ended. Mr. Kravchick testified that [J.S.] and [S.S.] were fearful of Mother because they were fearful of being hit. Mr. Kravchick testified that [C]hildren were hopeful about reunification in the beginning[ of the case,] but became discouraged. Mr. Kravchick testified that, as far as [C]hildren living together, … it is best not to disrupt their engagement with their own [placement] families, and that they are all doing very well with their placement families. … [Mr. Kravchick] testified that he believed [C]hildren would [suffer] no emotional harm if Mother was no longer involved with them, and that severing the bond [between Mother and Children,] and allowing [Children] to be adopted[,] would serve their overall physical and emotional wellbeing. ….

Orphans' Court Opinion, 3/19/26, at 8-9.

Ms. Mitchell testified that she supervised visitation between Mother and Children, and oversaw Mother's progress in Justice Works' nurturing parenting program. N.T., 1/27/26, at 93. Ms. Mitchell testified that Mother did not complete the nurturing parenting program. *Id.* Ms. Mitchell explained that

she "made a few attempts to do the [nurturing parenting] program with [Mother], went out to [Mother's] house, scheduled with [Mother] a few times; [but Mother] cancelled on me." ***Id.***

Regarding visitation, Ms. Mitchell testified that Mother's attendance was inconsistent. ***Id.*** at 97. Ms. Mitchell explained that when Mother appeared at the scheduled visitation sessions, her engagement with Children "was low. [Mother] pretty much would sit there." ***Id.*** Ms. Mitchell testified that Mother generally appeared "sleepy" during the visits. ***Id.*** at 98.

After visitation with Mother ended in October 2025, Ms. Mitchell testified that Children continued to have sibling visits at Justice Works. ***Id.*** at 108. Ms. Mitchell testified that she observed positive changes in the relationship between Children since visitation with Mother ended. ***Id.*** at 109.

In her testimony, Mother acknowledged that she was "resistant to addressing any drug and alcohol concerns" when Children were initially removed from her care. ***Id.*** at 111. Mother testified, however, that in September 2024, she attended Valley Forge's inpatient drug and alcohol program, which she completed in ten days. ***Id.*** at 112, 126. Mother admitted that CYS asked her to sign a release for CYS to obtain information regarding her treatment, but she did not recall whether she signed a release. ***Id.***

Mother testified that she continued the MAT program at Dunmore CTC following her successful discharge from inpatient treatment. ***Id.*** at 112-14. Mother explained that after completing the MAT program, she continued to

engage in medication management through Dunmore CTC, although she admittedly "did take a break." *Id.* at 114.

Mother claimed she had been receiving mental health treatment at The Wright Center since 2023 or 2024, and testified that she signed a release allowing CYS to obtain her treatment information. *Id.* at 114-15. *But see id.* at 131-32 (Mother admitting that she was not participating in mental health therapy, as The Wright Center only provides medication management, but that she had been "trying to get into The Robinson Center for a few months ….").

Mother testified that she signed up for parenting classes in November or December 2025, after learning that she "didn't have to go through Justice Works …." *Id.* at 120; *see also id.* at 26 (Mr. Murolo testifying that Mother's counselor at Dunmore CTC confirmed that Mother signed up for parenting classes that were scheduled to begin in March 2026).

Regarding her housing, Mother testified that she did not want to disclose her current residence to CYS because she was concerned caseworkers would "show up and make a scene in front of the landlord and things like that." *Id.* at 117; *see also id.* (Mother confirming that she was no longer residing with maternal grandmother). Mother testified that she did not want CYS to conduct a home assessment where she currently resides, because Mother did not believe that she would be living there with Children. *Id.* at 128-29.

At the conclusion of the hearing, the orphans' court terminated Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[9]  Mother timely filed notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements.[10]  Mother and the orphans' court have complied with Rule 1925.

Mother raises the following issues:

1.  Did the orphans' court commit an abuse of discretion and/or err as a matter of law when it determined [CYS] presented clear and convincing evidence to involuntarily terminate Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2)?

2.  Did the orphans' court commit an abuse of discretion and/or err as a matter of law when it determined [CYS] presented clear and convincing evidence to involuntarily terminate Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(5)?

3.  Did the orphans' court commit an abuse of discretion and/or err as a matter of law when it determined [CYS] presented clear and convincing evidence to involuntarily terminate Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(8)?

4.  Did the orphans' court commit an abuse of discretion and/or err as a matter of law by terminating Mother's parental rights, when it failed to evaluate and articulate the developmental,

_____

[9] The orphans' court's decrees do not specify the grounds for termination under Section 2511.  **See** Decrees, 1/27/26.  On the record, however, the orphans' court indicated that it was terminating Mother's parental rights pursuant to Section 2511(a)(2), (5), and (8).  N.T., 1/27/26, at 140-41.  Although the orphans' court did not refer to Section 2511(b) in its on-the-record discussion or in its decrees, it is apparent from our review that the orphans' court found sufficient evidence supported termination pursuant to Section 2511(b).  **See id.** at 141 (the orphans' court stating that "termination will best serve [C]hildren.  [C]hildren, based upon the testimony that's provided here today, are thriving …." (punctuation modified)).

[10] This Court *sua sponte* consolidated Mother's appeals.

physical, and emotional needs and welfare of [Children], under 23 Pa.C.S.A. § 2511(b)?

5. Did the orphans' court abuse its discretion when it failed to evaluate the effect of [Children's] bond with Mother, and effect that termination of that bond would have on [Children], when ordering Mother's parental rights be terminated under 23 Pa.C.S.A. § 2511(b)?

6. Did the [orphans'] court abuse its discretion by granting [CYS's] Petition/Request for Goal Change, when Mother's progress and compliance was restricted by CYS?

Mother's Brief at 8-9 (some capitalization and punctuation modified).

We review the termination of parental rights for an abuse of discretion.

*See Interest of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record

- 14 -

and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)); *see also In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003) ("[I]f competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result." (citation omitted)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Matter of S.H.D.N.*, 343 A.3d 737, 746 (Pa. Super. 2025) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of C.S.*, 327 A.3d 222, 237 (Pa. Super. 2024) (quoting *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*)). Finally, this Court need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to

affirm the termination of parental rights." ***Int. of M.E.***, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

In her first issue,[11] Mother argues that CYS failed to prove, pursuant to Section 2511(a)(2), that the conditions necessitating Children's removal cannot or will not be remedied. Mother's Brief at 14. Mother claims that her testimony at the TPR/goal-change hearing established that she completed an inpatient drug and alcohol program in 2024, and "re-engaged with her treatment at Dunmore CTC." ***Id.*** at 15-16.

According to Mother, CYS failed "to provide reasonable accommodations for Mother to comply with a request for [drug] screens at Justice Works[,]" or "make reasonable efforts to refer Mother to another agency for supervised visitation[.]" ***Id.*** Mother concludes that CYS's "failure to take reasonable steps for reunification cannot be used to terminate Mother's parental rights." ***Id.*** at 16 (capitalization modified).

CYS counters that the evidence presented at the TPR/goal-change hearing established that

> Mother has been unable or unwilling to demonstrate a sober lifestyle, successful parenting, appropriate supervision, or any level of accountability [concerning w]hat brought [] Children into CYS['s] custody. … [Mother] was provided with many service[s] to assist[ her], but [she] was still unsuccessful. [Mother] was

_____

[11] Mother's brief fails to comply with Pa.R.A.P. 2119(a), in that it argues Mother's first three issues together, under a single heading. ***Id.*** ("The argument shall be divided into as many parts as there are questions to be argued"). We refer to Mother's issues, herein, using the numerical designations she assigned to them in her statement of questions presented.

inconsistent with visitation, substance abuse treatment, mental health treatment, cooperation with the Agency, and drug screening. [Mother] blamed the Agency and other treatment providers, but never understood why [] Children came into protective custody. As a result of her taking no accountability, there was never any changed behaviors or circumstances.

CYS Brief at 19-20 (capitalization and punctuation modified).

Section 2511(a)(2) provides as follows:

**(a) General rule--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

….

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Int. of D.F.*, 165 A.3d 960, 967 (Pa. Super. 2017) (citation and brackets omitted). "The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).

"In reviewing the orphans' court's findings pursuant to [S]ection 2511(a)(2), we remain mindful that parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Interest of Z.N.B.*, 327 A.3d 241, 249 (Pa. Super. 2024) (citation, quotations marks, and brackets omitted). Section 2511(a)(2) "does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "[W]hile sincere efforts to perform parental duties can preserve parental rights under [Section 2511](a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2)." *Id.* (citation omitted; punctuation modified).

Relevantly, an agency's

provision or absence of reasonable efforts **may** be relevant to a court's consideration of both the grounds for termination and the best interests of the child. *In re Adoption of S.E.G.*, 901 A.2d 1017, 1029 (Pa. 2006). For example, as applicable to [Section 2511](a)(2), a court may find an agency's lack of assistance to a parent relevant to whether a parent's incapacity "cannot or will not be remedied by the parent." 23 Pa.C.S.[A.] § 2511(a)(2). Indeed, … at least in a situation involving a strong bond between parent and child prior to incarceration and a short term of incarceration, [] a child welfare agency cannot refuse reasonable efforts to an incarcerated parent and then point to the resulting erosion in the parental bond created by the agency as justification for termination of parental rights. **The fact that such a scenario can be articulated, however, does not transform the provision of reasonable efforts to reunite parents and children into a requirement for termination**.

- 18 -

*In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014) (citation modified; emphasis added); *Matter of Adoption of M.A.B.*, 16 A.3d 434, 445 n.10 (Pa. Super. 2017) ("An agency's failure to provide reasonable efforts to a parent does not prohibit the court from granting a petition to terminate parental rights under Section 2511." (citation omitted)); *In Interest of J.J.L.*, 150 A.3d 475, 482 (Pa. Super. 2016) (same).

Instantly, the orphans' court set forth the following rationale supporting its conclusion that CYS proved, by clear and convincing evidence, that termination of Mother's parental rights is warranted under Section 2511(a)(2):

> Despite [C]hildren being considered dependent for almost a year and a half, Mother has demonstrated a repeated and continued incapacity and refusal to give [C]hildren the essential parental care, control and subsistence necessary for [their] physical and mental well-being. Mother has refused to demonstrate her commitment to sobriety by refusing to participate in drug and alcohol testing. Additionally, Mother has failed to complete a parenting course, has failed to demonstrate the ability to properly care for and discipline [C]hildren, and has failed to take responsibility or accountability in her failure to comply with [the] placement plan for [C]hildren[. Mother] has failed to make any meaningful progress toward remedying the circumstances that necessitated placement in the first place.
>
> … Visits, which had not been fruitful, had been suspended due to Mother allegedly threatening Agency staff[, as reported by JWS]. Mother had been unable to demonstrate the ability to appropriately discipline[,] let alone care for[, C]hildren. There were still concerns regarding Mother's mental health and sobriety. The [orphans' c]ourt found that Mother would not be able to remedy these conditions within a reasonable time, as she had made minimal progress in doing so over the course of a year. The [orphans' c]ourt found that the services or assistance reasonably

- 19 -

available to Mother would not be likely to remedy the conditions which led to the removal of [C]hildren within a reasonable period of time, as Mother had outright refused the services and assistance available to help her maintain her sobriety.

Orphans' Court Opinion, 3/19/26, at 21-22.

The orphans' court additionally found that

the Agency has made reasonable efforts to finalize the permanency plan in effect. The Agency provided numerous services in an effort to finalize the permanency plan, including home visits, putting Mother in contact with providers, assisting Mother [enroll in] services like Justice Works, providing drug screening, providing Mother with a dumpster to help clean out [maternal grandmother's] house, and organizing [Mother's] visitation and siblings['] visits.

*Id.* at 16.

Upon careful review, the orphans' court's factual findings are supported by the record, and its conclusion is free of legal error. *See K.T.*, 324 A.3d at 56. The crux of Mother's Section 2511(a)(2) argument is that CYS's alleged "lack of due diligence," and "failure to take reasonable steps for reunification, cannot be used to terminate Mother's parental rights." Mother's Brief at 16-17 (capitalization and punctuation modified).[12] However, as noted above, our Supreme Court has explicitly held that "reasonable efforts to reunite parents

_____

[12] The authority Mother cites in support of this argument is inapposite. *See* Mother's Brief at 15-16 (citing *In the Interest of S.A.D.*, 555 A.2d 123, 128 (Pa. Super. 1989) (analyzing the agency's reasonable efforts in a **dependency** case), and *In the Interest of James Feidler*, 573 A.2d 587, 588 (Pa. Super. 1990) (same), *superseded by statute as stated in In re D.P.*, 972 A.2d 1221, 1226 (Pa. Super. 2009)).

and children" are not "a requirement for termination." ***In re D.C.D.***, 105 A.3d at 672.

Even if CYS was required to make such efforts in order to support termination under Section 2511(a)(2), we would agree with the orphans' court that CYS took reasonable steps to facilitate Mother's reunification with Children. Mr. Murolo testified at length regarding CYS's efforts to engage Mother in services to progress toward reunification with Children, which Mother refused, including offering (1) alternative, appropriate counseling programs; (2) drug testing programs; and (3) an opportunity to re-enroll in parenting classes. N.T., 1/27/26, at 25, 35, 102-03.

Moreover, the orphans' court acted within its discretion when it credited CYS's witnesses' testimony regarding the sincerity of Mother's efforts to remedy her deficient parenting, over Mother's testimony. ***See In re Adoption of C.P.D.***, 324 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)).

Accordingly, Mother's first issue merits no relief.[13]

_____

[13] Because we agree with the orphans' court that CYS established grounds for termination under Section 2511(a)(2), we need not address Mother's second and third issues, which challenge whether Section 2511(a)(5) or (8) supported termination. ***See Int. of M.E.***, 283 A.3d at 830.

We address Mother's fourth and fifth issues together, as they each challenge the orphans' court's determination under Section 2511(b). Mother argues that the evidence at the TPR/goal-change hearing established that she cares for Children. Mother's Brief at 18. Mother claims that her "lack of forceful discipline during her periods of visitation … shows that she was capable of providing for the needs and welfare of [C]hildren, including their mental health." *Id.* at 19.

Mother further argues that the orphans' court inappropriately failed to consider her bond with Children, or "to conduct an individual analysis for each child …." *Id.* at 22. Mother insists that the orphans' court "failed to recognize" that J.S. and J.T.L.S. were recently placed in their pre-adoptive foster home in December 2025, and that S.S. had only been in his pre-adoptive foster home for approximately five months at the time of the TPR/goal-change hearing. *Id.* at 22-23.

In response, CYS highlights Mr. Kravchick's testimony that while Children and Mother shared a bond, "the bond they shared was not a healthy bond." CYS Brief at 33 (citing N.T., 1/27/26, at 74-75). CYS additionally points out that it is "within the discretion of the [orphans'] court to prioritize the safety and security of children over their bonds with their parents." *Id.* at 35 (quoting *Interest of M.E.*, 283 A.3d at 839).

When an orphans' court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b); *see also Interest of N.A.S.*, 338 A.3d 191, 201 (Pa. Super. 2025) ("It is within the province of the orphans' court to consider the totality of the circumstances when performing a needs and welfare analysis." (quotation marks and citation omitted)).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted); *see also In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) (stating that "courts must keep the ticking clock of childhood

ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.").

Here, the orphans' court offered the following analysis for its conclusion that termination best serves Children's needs and welfare, pursuant to Section 2511(b):

> The [orphans' c]ourt determined that the termination of [Mother's] parental rights would best serve the needs and welfare of [C]hildren. [C]hildren need safe and stable environments that will address their mental and emotional health needs and that will allow them to form healthy attachments. [C]hildren's current placements provide those exact environments, though the [c]ourt is cautious of [S.S.'s] placement's prioritization of activities over therapy. Even then, a therapist is being found for [S.S.], and therapy is poised to continue. Overall, [C]hildren's physical, mental, and emotional needs are being met by their current placements, and [C]hildren are safe and cared for by their current [foster parents]. Mother's mental health and substance abuse jeopardized [C]hildren's needs and welfare and ultimately led to their removal from Mother. The fact that Mother has failed to take either of these concerns seriously led to the [orphans' c]ourt finding that [C]hildren's needs and welfare would be best served by termination of Mother's parental rights.
>
> ….
>
> When removed from Mother's care, [C]hildren needed to be taught basic hygiene. [C]hildren have been in therapy[,] in which they have revealed they were physically abused by Mother, and [S.S.] has been diagnosed with RAD, which jeopardizes his ability to form healthy attachments. [C]hildren are having their developmental, physical and emotional needs being met [by their respective foster parents, who] love and care for them. [C]hildren are working through their trauma in therapy, are thriving in school, and are physically healthy. Mr. Kravchick testified that [C]hildren's [respective] abilities to emotionally regulate have improved over the course of their placements, and that their abilities have continued to improve since visitation with Mother has stopped. Mr. Kravchick [] testified that even [Children's] sibling bond has improved, and there was a correlation between

an uptick in negative behaviors and [their] visits with Mother. [C]hildren are finally beginning to thrive, and the [orphans' c]ourt found that termination of Mother's parental rights would best serve [C]hildren's needs and welfare. While the [c]ourt acknowledges that there is a bond between Mother and [C]hildren, in reviewing the evidence, the [c]ourt found that termination of said bond would not negatively impact [C]hildren and, in fact, would benefit them, as cutting off visitation inadvertently already has.

Orphans' Court Opinion, 3/19/26, 22-24; *see also id.* at 11 (noting that J.S. and J.T.L.S. have built a "good relationship with" D.F., and S.S. "has a strong bond with" M.B.).

Upon review, the orphans' court's factual findings are supported by the record, and we discern no abuse of discretion in the court's conclusion that termination best serves Children's interests. *Interest of K.T.*, 296 A.3d at 1104; *Interest of N.A.S.*, 338 A.3d at 201. Contrary to Mother's argument, the orphans' court considered whether Mother and Children share a bond, but appropriately exercised its discretion in determining that the needs of Children outweighed that bond. Further, the fact that Children were uniformly, and negatively, impacted by Mother's conduct is not evidence that the orphans' court failed to consider Children individually. On the contrary, the orphans' court outlined how each child has improved since being removed from Mother's care, and found that Children's respective foster homes provide stable environments that attend to their mental and emotional needs. *Interest of K.T.*, 296 A.3d at 1113.

Accordingly, Mother's fourth and fifth issues entitle her to no relief.

Based upon the foregoing, we affirm the decrees terminating Mother's parental rights.[14]

Decrees and orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/13/2026

---

[14] As we conclude the orphans' court did not abuse its discretion in terminating Mother's parental rights, Mother's sixth and final issue is moot. *See In re Adoption of A.H.*, 247 A.3d at 446 (holding that "our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change" a child's permanency goal from reunification to adoption); *Interest of N.A.S.*, 338 A.3d at 202 (concluding orphans' court did not err in terminating parental rights, and affirming goal-change order after deeming issue moot).